FILED
2014 Feb-18  AM 08:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| SHEENA BISHOP, | ) | |
| as custodial parent and next friend of | ) | |
| Cheyenne Nicole Bishop, a minor, | ) | |
| deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-cv-2457-TMP |
| | ) | |
| R.A. WAGNER TRUCKING | ) | |
| COMPANY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| NOAH HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-cv-2003-TMP |
| | ) | |
| THOMAS EARL MORRISON, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

These consolidated actions are before the court on a motion for summary judgment filed on December 13, 2013, by defendants R.A. Wagner Trucking Company, Inc., Thomas Earl Morrison, and R.A.W. Motor Carrier, LLC ("Defendants").  (Doc. 52).  In the motion, Defendants seek judgment in their favor and dismissal of plaintiffs' claims under Alabama tort law.  All parties have consented to the exercise of full dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 14).  Having considered the pleadings and the evidence

and arguments submitted by all parties, the court finds that the motion for summary judgment is due to be granted in part and denied in part.

## I. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. V. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a

genuine issue of fact requiring a jury determination.   See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.   Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

The failure to respond to a motion for summary judgment is not enough, in itself, to justify granting summary judgment.   Indeed, Rule 56(a) instructs that the court shall grant summary judgment only "*if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a) (emphasis added). Thus, a court "may neither grant nor deny summary judgment by default."   James Wm. Moore et al., Moore's Federal Practice, § 56.99[b] (3d ed. 1997).   As noted by the Advisory Committee, "summary judgment cannot be granted by default *even if there is a complete failure to respond to the motion*, much less when an attempted response fails to comply with Rule 56(c) requirements." Fed. R. Civ. P. 56 advisory committee's note (emphasis added).   Because "the district court cannot base the entry of summary judgment on the mere fact that it is unopposed, it must consider

the merits of the motion."   United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004).   Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

## II.   Facts for Summary Judgment Purposes[1]

Applying these standards to the evidence before the court, the following facts are treated as undisputed and taken in a light favorable to the non-moving plaintiffs.[2]   On August 31, 2010, at approximately 7:20 a.m., at exit 205 North on Interstate 59 in Collinsville, Alabama, Morrison, while using and/or in possession of a tractor-trailer truck ("rig") belonging to R.A.W. Motor Carriers ("R.A.W."), and while in the employ of defendant R.A. Wagner Trucking Company, Inc. ("Wagner"), was involved in an accident with a Chevrolet Tahoe driven by plaintiff Noah Hall ("Hall") and occupied by then five-year-old Cheyenne Bishop.   Hall and Cheyenne both were wearing seatbelts, but Cheyenne was in the front seat and was not in a child safety seat.   Hall sustained serious injuries, and Cheyenne was killed in the accident.   As a result of that accident, Hall, on behalf of himself, and Sheena Bishop ("Bishop"), as custodial parent and next friend of

---

[1]   Defendants filed a motion to strike on January 16, 2014, which was GRANTED IN PART and DENIED IN PART.   The evidence disputed in the motion to strike, however, was not used in the evaluation of Defendants' motion for summary judgment.

[2]   The fact statements provided by the plaintiffs do not provide an overview of all associated facts, but are, instead, specifically focused on facts that are either not addressed by the defendants' motion for summary judgment or disputed by the plaintiffs. Therefore, to the extent that a fact alleged in the defendants' motion for summary judgment is not addressed, the facts provided by the defendant will be deemed undisputed.

Cheyenne Bishop, a deceased minor, filed their separate suits against Defendants, which the court has consolidated.

On the day of the accident, the weather was clear and sunny with roughly ten miles of visibility for drivers. The trailer that Morrison had attached to his tractor was a 1996 Utility Trailer, and its rear impact guards are governed by 49 C.F.R. § 393.86(b)(1). At the time of the accident, Morrison had parked his rig on the emergency lane of the interstate's entrance ramp.[3] The hood of Morrison's rig was still open, indicating that Morrison was not yet ready to resume driving. Hall's Tahoe left the travel lane and entered the emergency lane and, from the center line of the Tahoe to the right side, collided with the back left corner of Morrison's rig. Due to his injuries, plaintiff Hall does not remember what actually occurred at the time of the accident. (Hall Depo. at 20). Prior to the accident Hall had not been drinking alcohol, using any kind of drugs, or participating in any action that would have impaired his driving ability.

At the time of the collision, Morrison was acting within the line and scope of his employment as a driver for Wagner, for whom he had worked since 1996. He was not under the influence of any drugs, controlled substances, or alcohol, but he suffered from diabetes, which was being controlled by medication. (Harbolt Depo. at 15). Morrison's employer, Wagner, was aware of his medical condition. He does not recall whether he took his medication or ate breakfast the morning of the accident. Morrison did not have a proper DOT medical examiner's certificate stating that he was fit to operate a tractor trailer. In 2010, R.A.W. and Wagner were

---

[3]   There is some debate as to whether this are should be referred to as the "emergency lane" or as the "shoulder." As the non-moving plaintiffs refer to the area as the "emergency lane," for purposes of summary judgment so will the court.

governed by the Federal Motor Carrier Safety Regulations[4] ("Regulations").   As a commercial vehicle driver, Morrison was required to follow the Regulations.   Morrison had received a copy of the Regulations and signed a receipt agreeing to familiarize himself with them.   In 2010 the Regulations required all commercial drivers of vehicles with a maximum gross vehicle weight rating of over 10,000 pounds, a category which Morrison occupied, to maintain a valid medical examiner's certificate.[5]   Morrison's employers had never asked for or received Morrison's DOT long form documenting his physicals.[6]   (Wagner Depo. at 30-31).

Because Morrison did not have the required medical examiner's certificate, he presented the officer on the scene of the collision with two medical cards; however, when questioned, the doctors who had purportedly issued the cards testified that the signatures on the cards were not theirs or authorized signatures.   (Park Depo. at 14; Harbolt Depo. at 13).   The doctors also had no records showing that either of them performed a DOT physical on Morrison.   (Park Depo. at 14-16; Harbolt Depo. at 13).   The doctor treating Morrison's diabetes testified that he had never performed a DOT physical on Morrison and that Morrison's visits were utilized to get his diabetes medication refilled.   (Harbolt Depo. at 13).   As admitted by R.A.W. and Wagner, lacking a valid medical card made Morrison unqualified to drive a tractor trailer under 49 C.F.R.

---

[4]   49 C.F.R. §§ 350-399.

[5]   "A person subject to this part must not operate a commercial motor vehicle unless he or she is medically certified as physically qualified to do so, and, except as provided in paragraph (a)(2) of this section, when on-duty has on his or her person the original, or a copy, a current medical examiner's certificate that he or she is physically qualified to drive a commercial motor vehicle."   49 C.F.R. § 391.41(a)(1)(i).

[6]   Wagner contends that the Regulations only require the employer to keep a copy of the long form *or* the medical card, and Morrison's employer simply chose to keep a copy of the card rather than the long form.

§ 391.41(a)(1)(i).   Because he was not in compliance with § 391.41(a)(1)(i), Morrison should not have been on the road on the day of the accident.   (Wagner Depo. at 70-72).

On the day of the accident, Morrison left Mitchell Grocery in Albertville and traveled south on Highway 431 into Gadsden, Alabama.[7]   There were several inconsistencies in Morrison's log books.   The log books misstated where Morrison had been in the hours leading up to the collision and did not show where he had actually driven or made stops.   When Morrison merged onto Interstate 59 North in Gadsden, he was delayed by road construction.   Near the end of the construction, Morrison heard a sound which he believed may have been caused by his metal oil cap coming off and banging under the hood.   Such an incident had happened twice in the past. Morrison did not document this suspected mechanical problem on his pre-trip or post-trip logs. He did not note any defects with his rig in his log books.   In order to examine the problem, Morrison needed to pull over, but he determined that it was too dangerous to stop on the side of the interstate.   He took exit 205, across the intersecting highway to the entrance ramp for Interstate 59 North at exit 205, and pulled off the travel portion of the entrance ramp and into the emergency lane.   Morrison acknowledged that it was also dangerous to stop in the emergency lane of the entrance ramp.   (Morrison Depo. at 128).

When Morrison pulled into the emergency lane and parked, he did not turn on his hazard lights or set out his emergency reflective triangles.[8]   The Regulations require that when a driver is stopped for any cause other than necessary traffic stops, he should immediately turn on his hazard

---

[7]   Morrison did not complete a pre-trip inspection of his rig before leaving Albertville.

[8]   Morrision testified that he did turn on his hazard lights when he stopped the rig, but admitted that he did not put out his reflective triangles.   (Morrison, Depo. at 144).   However, Trooper James Bryan Ray, the officer who first arrived on the scene of the accident, testified that Morrison turned his hazard lights on *after* the impact.   (Ray Depo. at 201, 220).

lights and set out his emergency reflective triangles no more than ten minutes after he stops.[9] Wagner, Morrison's employer, agreed that when Morrison parked his rig in the emergency lane, he was required to immediately turn on his hazard lights and was required to place his reflective triangles in compliance with 49 C.F.R. § 392.22(b).  Wagner acknowledged that a driver who parked his rig in the emergency lane should either have emergency flashers on or have set his reflective triangles.

Trooper James Bryan Ray ("Trooper Ray"), the responding officer, testified that, in his opinion, there were several other places where Morrison could have pulled off the road safely and parking in one of those places would not have placed him or other motorists in danger.   Trooper Ray listed some of these places as the parking lot beside Jack's Restaurant, approximately seventy-five feet from where Morrison stopped; Smokin' Joe's truck stop, which has a large truck parking area; a nearby gravel lot where rigs are sometimes parked; or a Conoco gas station that is nearby, but not visible from where Morrison was parked.  He testified that, by parking his rig where he did, Morrison created an unsafe condition.   In Trooper Ray's opinion, it was not safe to park on the emergency lane of an entrance ramp, and he would never recommend someone do so.

---

[9]   49 C.F.R. § 392.22 **Emergency signals: stopped commercial motor vehicles**.
(a) Hazard warning signal flashers.  Whenever a commercial motor vehicle is stopped upon the traveled portion of a highway or the shoulder of a highway for any cause other than necessary traffic stops, the driver of the stopped commercial motor vehicle shall immediately activate the vehicular hazard warning signal flashers and continue the flashing until the driver places the warning devices required by paragraph (b) of this section. . . . The flashing lights may be used at other times while a commercial motor vehicle is stopped in addition to, but not in lieu of, the warning devices required by paragraph (b) of this section.

(b) Placement of warning devices -- (1) General rule.  Except as provided in paragraph (b)(2) of this section, whenever a commercial motor vehicle is stopped upon the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops, the driver shall, as soon as possible, but in any event within 10 minutes, place the warning devices required by § 393.95 of this subchapter . . .

However, Morrison was not cited for improperly parking in an emergency lane to an entrance ramp, and there was no sign posted on the entrance ramp warning drivers not to park there. Morrison's actions were not illegal.

Trooper Ray was traveling on Interstate 59 South at exit 205 when he was notified of the accident.  When he arrived at the scene, Morrison's truck was parked fully in the emergency lane and Hall's Tahoe, up to and including the passenger compartment, was underneath the trailer. Trooper Ray testified that, based on his observations, Morrison's rig was completely in the emergency lane at the time of the accident.  The minor decedent, Cheyenne Bishop, was belted into the right, front passenger seat of the vehicle and was not in a child's seat or booster seat. Trooper Ray's report did not specifically indicate that where Morrison parked his rig contributed to the accident, but it did state that Morrison made a bad decision by parking where he did and that "[a] combination of the location that the truck driver parked his truck and the fact that Mr. Hall failed to maintain his lane of travel," was the cause of the accident.  (Ray Depo. at 129-131). Trooper Ray states in his conclusion that the crash occurred because Hall was not in full control of his vehicle and allowed it to drift into the emergency lane of the entrance ramp.  (Ray Depo. at 129).  There were no known conditions that would have prevented Hall from seeing Morrison's rig while he was traveling on the entrance ramp.  (Id. at 221).

A video from the convenience store adjacent to the northbound entrance ramp on Interstate 59 at exit 205 shows traffic taking the entrance ramp onto Interstate 59 North.  The video shows the vehicles involved in the accident, but does not capture the collision itself.  The video shows Morrison's rig coming off the exit ramp at exit 205 on the northbound side, coming to a stop at the stop sign on the bottom of the exit ramp, waiting on traffic to clear so he can proceed across, and traveling back up the entrance ramp on the northbound side of Interstate 59.  (Ray

Depo. at 41-42).   The video indicates that Morrison begins traveling up the entrance ramp at 7:16 a.m.   Hall entered the ramp at 7:20 a.m., and the accident occurred seconds later.

As part of his investigation, Trooper Ray downloaded the Tahoe's airbag module that collects data and stores it when a hard braking event or an extreme change in velocity occurs.   The data stored in the airbag module recorded only five seconds prior to the impact.   At five seconds prior to impact, the Tahoe was traveling 47 miles per hour.   It reached a maximum speed of 52 miles per hour within one second of impact.   The data showed that the brake switch was off, indicating that Hall did not depress his brakes prior to impact.

Hall was 17 years old at the time of the accident.   He was attending Fort Payne High School and had been driving to school for roughly two years.   The entrance ramp where the accident occurred was part of Hall's normal route to school, and he was very familiar with that particular entrance ramp.   Hall did not have a need for corrective glasses or contacts, nor did he have any medical conditions that had the potential to affect his ability to safely drive a car.   Hall had the Tahoe he was driving on the day of the accident for around one year prior to the accident, and it was available to him for everyday use.   The vehicle was mechanically sound.   At his deposition, Hall viewed four pictures of the entrance ramp where the accident occurred, with the rig parked on the shoulder at the location of the accident.   The first picture was taken at the bottom of the entrance ramp, and each subsequent picture was taken progressively closer to the rig.   Hall testified that he could see the rig in all four photographs.   (Hall Depo. at 26-29).   He was aware that the yellow line on the left side of the road and the white line on the right side of the road designate the travel portion of the road.   (Id. at 30).

Hall testified that, in general reference to the entrance ramp where the accident occurred, there is no visual impediment that would prevent someone from seeing an eighteen-wheel rig

11

parked where Morrison's was on the day of the accident.   He also testified that it would not be advisable for a car to travel on the emergency lane of the entrance ramp.   Hall stated that he takes some responsibility for the accident.   (Hall Depo. at 41-43).   Hall estimated that he had driven on the entrance ramp at least one hundred times prior to the accident.   (Id. at 56).   There is a long acceleration lane that runs next to Interstate 59 once vehicles leave the entrance ramp and get onto the surface of the highway.   Therefore, Hall testified that there was no reason for him not to be looking straight forward as he came up the entrance ramp.   (Id. at 73).   Due to his injuries, Hall does not remember the accident at all.   (Hall Depo. at 20).

## III. Discussion

In this action, Plaintiffs' assert five claims relevant to the pending motion for summary judgment, summarized as follows:

> Count I: Negligence and/or Wantonness alleges that Morrison negligently and/or wantonly operated his motor vehicle, causing the wreck with plaintiff Hall's vehicle and that Morrison's employers, R.A. Wagner Trucking Company, Inc. ("Wagner") and R.A.W. Motor Carriers, L.L.C. ("R.A.W."), are directly liable under the theory of *respondeat superior*.

> Count II: Negligent and/or Wanton Hiring alleges that Wagner and R.A.W. negligently and/or wantonly hired Morrison without doing a proper background investigation, driving history check, or criminal history check. The plaintiffs allege that this negligence and/or wantonness contributed to the wreck with Hall's vehicle.

> Count III: Negligence and/or Wanton Training alleges that Wagner and R.AW. negligently and/or wantonly trained Morrison at the time of his hiring and during his employment.   The plaintiffs allege that this negligent and/or wanton training prevented Morrison from being a qualified commercial vehicle driver, leading to the cause of the wreck with Hall's vehicle.

Count IV: Negligent and/or Wanton Supervision alleges that Wagner and R.A.W. negligently and/or wantonly supervised Morrison, preventing Morrison from being a qualified commercial vehicle driver.   The plaintiffs allege that this negligent and/or wanton supervision contributed to the cause of the wreck with Hall's vehicle.

Count V: Negligent and/or Wanton Alteration of Tractor Trailer alleges that Defendants negligently and/or wantonly altered the end of the tractor/vehicle so that it was not in compliance with Federal or State laws. The plaintiffs allege that operating this unlawfully altered vehicle on the public roads proximately cause the death of Cheyenne Bishop and the injuries of Hall.

(Doc. 1).   The court will address each count in turn.

## A.   Count I

### i. Negligence on the part of Defendant Morrison

In order to be entitled to summary judgment, Defendants must show that a reasonable jury could not find that Morrison negligently operated his motor vehicle, causing the wreck with plaintiff Hall's vehicle and thereby causing the injuries to Hall and the death of Cheyenne Bishop. Defendants argue that Hall's behavior was the sole proximate cause of the accident and, therefore, the defendants are entitled to summary judgment as to Count I as it relates to negligence on the part of Morrison.

Defendants attempt to analogize the instant case to Carroll v. Deaton, in which the plaintiff driver had a blood alcohol content of greater than .10, rendering him negligent *per se* under the Alabama Code, and the defendant did not properly equip his trailer with a red light, also rendering him negligent *per se* under the Alabama Code.   555 So. 2d 140, 141 (Ala. 1989).   The Supreme Court of Alabama stated that "[o]rdinarily, such breaches would create an issue of fact for the jury regarding proximate cause. . . . However, . . . here the proximate cause of Carroll's accident was

not the absence of lights on Deaton's trailer, but rather Carroll's intoxication, which caused him to leave the highway." Id. at 141.

The instant case is simply not close enough to the facts of Carroll for this court to follow its reasoning. First, there is not a clear case of negligence *per se* by any party. Plaintiff Hall was not intoxicated at the time of the accident and does not remember what occurred. Defendant Morrison also was not intoxicated at the time of the accident. There is a factual dispute as to whether Morrison properly followed applicable safety regulations. There is a dispute as to Morrison's testimony that his hood was closed, creating a question of whether Morrison was about to leave the location. There is also a dispute as to whether Morrison had his hazard lights on, as required by section 392.22 of the Federal Motor Carrier Safety Regulations, and there is a dispute as to whether Morrison was required under the regulations to put out his reflective triangles, which he admittedly did not do.[10] The purpose of requiring drivers to immediately turn on hazard lights and to put out reflective triangles is to allow them to be seen by other drivers in order to prevent collisions. The fact that the accident took place in the emergency lane rather than the traveled portion of the entrance ramp is not enough to establish that Hall was the *sole* proximate cause of the accident.

Although the Supreme Court in Alabama stated in Carroll that "a Plaintiff in a negligence case cannot recover ... where Plaintiff's own negligence is shown by his or the Defendant's proof to have proximately contributed to his damage," this is but a simple statement of the contributory negligence rule in Alabama. Even so, contributory negligence is ordinarily as question for the jury, and is only rarely resolved as a matter of law. See Bogue v. R & M Grocery, 553 So. 2d 545,

---

[10]   49 C.F.R. § 392.22

547 (Ala. 1989); <u>Hannah v. Gregg, Bland & Berry, Inc.</u>, 840 So. 2d 839, 860 (Ala. 2002) ("The question of contributory negligence is normally one for the jury. "); <u>Beddingfield v. Central Bank of Alabama, N.A.</u>, 440 So.2d 1051, 1053 (Ala. 1983); <u>Curry v. Welborn Transp.</u>, 678 So. 2d 158, 161 (Ala. Civ. App. 1996).   Defendants have not submitted enough evidence to prove contributory negligence as a matter of law for purposes of summary judgment.   555 So. 2d at 141. In <u>Carroll</u>, the plaintiff was negligent *per se* due to his elevated blood alcohol content.   <u>Id.</u>   There is no such negligence *per se* here.   Defendant attempts to use various statements from Hall's deposition to prove contributory negligence.   Defendant claims that because Hall "acknowledged in deposition that there was no reason for him not to be able to see the rear of the trailer ... from the bottom of the on-ramp," and "admitted that all he had to do in order to avoid the accident was to continue traveling up the travel lane of the on-ramp to avoid impacting trailer," he has admitted to contributory negligence.   (Hall Depo. at 39, 73).   However, the court cannot ignore the undisputed fact that Hall, due to the injuries he suffered, *does not recall* the accident or the events leading up to the accident.   The court is not willing to accept Hall's answers to hypothetical questions as definitive proof of contributory negligence.

Defendants admit that the defense of contributory negligence cannot be asserted against Bishop's action based upon the death of Cheyenne, the passenger in Hall's vehicle.[11]   But they argue that Bishop has not made a case of negligence on the part of Morrison.   Taking the facts in the light most favorable to the non-moving plaintiff, Morrison parked on the emergency lane of the on-ramp without turning on his hazard lights or putting out his reflective triangles.   Applicable regulations required Morrison to do one or both of these things.   Morrison's failure to follow

---

[11]   Of course, it should be noted that Cheyenne was five years old at the time of her death and, therefore, too young to be guilty of contributory negligence as a matter of law, even if it might be argued that she somehow contributed to the cause of the collision.

regulations is negligence *per se* and, therefore, Bishop has made a case that negligence on the part of Morrison was the proximate cause of the accident.   Because Cheyenne, as a passenger, could not be charged with contributory negligence, Bishop could be entitled to damages from Defendants based on possible concurrent negligence, even if a jury found Hall to be contributorily negligent.   As stated above, the Defendants have not presented sufficient evidence to prove as a matter of law that Hall was the sole proximate cause of the accident and, therefore, their motion for summary judgment based on the theory of Hall's alleged negligence must fail as to both Hall and Bishop.

Defendants also argue that, even assuming negligence by Morrison, his negligence was "merely a condition that gave rise to the accident" and that Hall's driving onto the emergency lane of the entrance ramp was an intervening agency and the sole proximate cause of the accident.   The Supreme Court of Alabama has stated that,

> 'Whenever a new cause intervenes which is not a consequence of the first wrongful cause, which is not under the control of the wrongdoer, which could not have been foreseen by the exercise of reasonable diligence by the wrongdoer, and except for which the final injurious consequences would not have happened, the second cause is ordinarily regarded as the proximate cause and the other as the remote cause.' . . . And . . . the converse is true, when a 'person by his negligence produces a dangerous condition of things, which does not become active for mischief until another person has operated upon it by the commission of another negligent act, which might not unreasonably be anticipated to occur.   The original act of negligence is then regarded as the proximate cause of the injury which finally results.'

Tindell v. Guy, 243 Ala. 535, 863-864 (Ala. 1942) (quoting Clendon v. Yarbrough, 233 Ala. 269, 270, 171 So. 277, 278 (Ala. 1936).   Defendants argue that any negligence by Hall falls into the

former category, while Plaintiffs argue that it falls into the latter category of a negligent act "which might not unreasonably be anticipated to occur."

This intervening cause argument seems to be nothing more than a repackaging of Defendants' contributory negligence defense.   In the instant case, reasonable minds could very well differ as to whether Hall's drifting into the emergency lane was foreseeable to Morrison and therefore not an intervening cause.   In Albert v. Hsu the Supreme Court of Alabama discussed foreseeability as it relates to whether there is a duty to the plaintiff.   602 So. 2d 895, 897 (Ala. 1992).   In Albert a restaurant patron inadvertently backed her car into a restaurant, killing a child whose parents then brought suit against the restaurant.   The Court rightly determined that foreseeability was too remote to give rise to a duty on the part of the restaurant to protect against vehicles colliding with the building.   While a car driving through a building's windows is not a situation that a building owner would reasonably foresee and therefore need to protect against, a rear-end collision between two vehicles is a much closer question.   A reasonable jury could find that a truck driver, when parked in the emergency lane of an entrance ramp with no hazard lights on or reflective triangles in place, could have foreseen that an oncoming vehicle may run into the rear of the rig and that injuries could result.   Indeed, the foreseeability of such rear-end collisions is precisely the reason why DOT Regulations require the use of flashers and warning triangles. Because a reasonable jury could determine that Morrison could have or should have foreseen the accident, Defendants' motion for summary judgment based on Hall's actions being an intervening cause is due to be denied.

### ii. Wantonness on the part of defendant Morrison

The Alabama Code defines wantonness, as it relates to civil law, as "[c]onduct which is carried on with a reckless or conscious disregard for the rights or safety of others."   Alabama

Code § 6-11-20(b)(3) (1975).   Several cases cite <u>Bozeman v. Central Bank of the South</u>'s definition of wantonness as the agreed upon definition in Alabama.   646 So. 2d 601 (Ala. 1994). In <u>Bozeman</u>, the Supreme Court of Alabama settled the definition of wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." 646 So. 2d at 603 (citing <u>McDougle v. Shaddrix</u>, 534 So. 2d 228 (Ala. 1988)).

The question regarding wantonness, therefore, is whether Morrison parked in the emergency lane of the entrance ramp while being conscious that doing so would *likely* or *probably* result in injury.   Morrison states in his deposition that he parked where he did because, while still dangerous, he believed it to be safer than parking on the shoulder of the interstate.   Trooper Ray, along with other witnesses and experts testifying in the case, including an Alabama Department of Transportation sign inspector, all have used the emergency lane or shoulder of the road repeatedly to do various activities, despite the fact that they all agree that doing so poses hazards.   It is not this court's position that simply because numerous people, at one time or another, have parked a car on the emergency lane of a highway ramp, that the behavior is not dangerous or even negligent. However, the fact that parking on the shoulder of the road is common, and even encouraged in some situations, undermines the idea that the behavior is wanton as defined by Alabama statutory and common law.

Plaintiffs contend that by admitting that parking in the emergency lane is dangerous, Morrison creates a triable issue regarding wantonness.   However, knowing something is dangerous and knowing that an injury *probably* or *likely* will result are not legally interchangeable. Further, the fact that there were other arguably safer places to park nearby does not lend itself to proving that Morrison, by choosing a "less safe" place to park, knew an injury would probably or

18

likely result.   Plaintiffs have failed to present evidence that Morrison's behavior rose to the definition of wantonness and, therefore, the defendants' motion for summary judgment as to Hall's and Bishop's claims of wantonness against defendant Morrison is due to be granted.

### iii. Negligence and/or Wantonness on the part of defendants Wagner and R.A.W. under the theory of respondeat superior

Because Defendants' motion for summary judgment as to Plaintiffs' claims of Morrison's negligence are due to be denied, Defendants' motion for summary judgment as to Plaintiffs' claims of negligence against Wagner and R.A.W. under the theory of *respondeat superior* is also due to be denied.   Conversely, because Defendants' motion for summary judgment as to Plaintiffs' claims of Morrison's wantonness are due to be granted, Defendants' motions for summary judgment as to Plaintiffs' claims of wantonness against Wagner and R.A.W. under the theory of *respondeat superior* are also due to be granted.

### B. Counts II, III, and IV: Negligent and/or Wanton Hiring, Training, and Supervision by defendants Wagner and R.A.W.

Alabama law explains the torts of negligent hiring, negligent supervision, and negligent training as follow:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.   Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.   It is incumbent on the party charging negligence to show it by proper evidence.   This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.   While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act

> complained of, it is proper, when repeated acts of carelessness and
> incompetency of a certain character are shown on the part of the servant to
> leave it to the jury whether they would have come to his knowledge, had he
> exercised ordinary care.

Armstrong Business Services, Inc. v. AmSouth Bank, 817 So. 2d 665, 682 (Ala. 2001) (quoting

Bib B, Inc. v. Cottingham, 634 So. 2d 999, 1003 (Ala. 1993)) (quoting Lane v. Central Bank of

Alabama, N.A., 425 So. 2d 1098, 1100 (Ala. 1983)) (quoting Thompson v. Havard, 285 Ala. 718,

725, 235 So. 2d 853 (1970)).   The Plaintiffs claim that evidence exists that Morrison was an

incompetent driver and that Wagner and R.A.W. should have known about his incompetence had

they exercised ordinary care.   Plaintiffs proffer Morrison's forged DOT medical cards as evidence

of his incompetence under the Regulations, and then extrapolate from this that Morrison was

medically unable to drive a rig and that Morrison did not undergo his required physical because he

may have felt that he would not meet the qualifications.   However, this argument does not stretch

quite far enough to illustrate the conclusion that Wagner and R.A.W. knew or should have known

about the forged medical card, much less any medical inability on Morrison's part, even assuming

that Morrison's motives were as Plaintiffs allege.   There is evidence that Wagner had copies of

Morrison's medical cards, and it is disputed that Wagner could or should have known they were

forged.

Plaintiffs also point to Morrison's inaccurate log books to show incompetence that Wagner

and R.A.W. knew or should have known about.   Again, Plaintiffs' argument does not stretch far

enough.   Plaintiffs point to the incorrect entry the night before the accident and Morrison's failure

to conduct his pre-trip inspection on the morning of the accident.   These two incidents in no way

indicate a pattern of incompetence of which Wagner and R.A.W. could or should have been aware.

Plaintiffs do not indicate a pattern of such incidents or proffer any evidence that such incidents happened at any other time.  Their evidence simply fails to show that there was any reason for Wagner or R.A.W. to be aware of Morrison's alleged incompetence as a driver.

Plaintiffs also allege that because Wagner and R.A.W. were aware that Morrison had a "sugar problem," the companies should have required regularly-filed long forms from Morrison's physician and should have questioned the forms' failure to arrive.   Other than merely making the allegation that diabetics who do not take their medicine may be "confused," and pointing to the fact that Morrison does not remember if he took his medication or ate the morning of the accident, Plaintiffs do not allege any link between Morrison's forged medical card or log discrepancies and the accident.  There is no evidence that Morrison's forged medical card or log discrepancy or even his diabetes proximately caused the collision.

It is possible that Morrison's failure to turn on his hazard lights or put out his reflective triangles contributed to the accident, but those acts of negligence are not acts which R.A.W. and Wagner could or should have been on notice of.   "[A] single instance of negligence will not prove an employee incompetent, nor will it impute knowledge to his employer of incompetency; the most competent employee may be negligent."  Collins v. Wilkerson, 679 So. 2d 1100,1103 (Ala. Civ. App. 1996)(upholding lower court's grant of summary judgment as to negligent supervision claim even where the question of the employee's own negligence was a question of fact for the jury).

Furthermore, "[a] negligent hiring claim requires that the plaintiff establish by affirmative proof that the employer actually knew or should have known of the employee's incompetence prior to hiring the employee."  Nisbet v. George, 2006 WL 2345884, *2 (M.D. Ala. Aug. 11, 2006).

Plaintiffs have offered no evidence that Wagner or R.A.W. knew or should have known of any incompetence on Morrison's part prior to hiring him. Indeed, the evidence seems to be that Morrison worked for Defendants since 1996, apparently in a competent fashion as there is no evidence of repeated instances of negligence or incompetence by him. Because there is no indication in the facts, taken in the light most favorable to the nonmoving plaintiffs, that Wagner or R.A.W. had notice of any incompetence on Morrison's part that in any way contributed to the accident, the motion for summary judgment as to Plaintiffs' claims of negligent and/or wanton hiring, training, and supervision of Morrison is due to be granted.

### C. Negligence and/or wantonness - Alteration of the Trailer

Plaintiff Hall asserts in his complaint that "[D]efendants negligently and/or wantonly altered the end of the tractor/vehicle and operated same on the public roads of Alabama. So that, it was not in compliance with Federal/State laws (to-wit: D.O.T.), with the aforesaid laws [and] proximately caused the death of a passenger and proximately caused plaintiffs [sic] injuries & damages." Defendants argue that this claim should be dismissed on summary judgment because Morrison's trailer was manufactured before January 26, 1998, and therefore is not subject to the requirements set forth for trailers manufactured after that date. According to Defendants, Morrison's trailer meets the requirements set forth for trailers manufactured prior to 1998. Plaintiff Hall alleges nothing in his response to Defendants' motion for summary judgment addressing the issue.

The current Regulations (the same as those in effect in 2010) require Rear Impact Guards and Rear End Protection on trailers and semi-trailers manufactured on or after January 26, 1998, to be permanently marked or labeled providing a certification that the rear impact guard meets the

22

requirements of the Federal Motor Vehicle Safety Standard Number 223 (49 C.F.R. 571.223) in effect at the time the vehicle was manufactured.   49 C.F.R. 393.86(a)(1).   Section 393.86(b)(1) provides the requirements for motor vehicles manufactured after December 31, 1952 (except trailers or semi-trailers manufactured on or after January 26, 1998).   This section is applicable to Morrison's 1996 Utility Trailer.   Section 393.86(b)(1) does not contain a provision requiring that the rear impact guards meet the requirements of the Federal Vehicle Safety Standard Number 223 or be DOT certified.   Because neither plaintiff has put forth any evidence indicating that Morrison's trailer was incompatible with applicable regulations, Defendants motion for summary judgment as to Hall's claim that the trailer was in violation of federal regulations is due to be granted.

## CONCLUSION

In conclusion, Defendants' motion for summary judgment as to plaintiff Hall's and plaintiff Bishop's claims of negligence against Morrison and against Wagner and R.A.W. under the theory of *respondeat superior* is due to be DENIED.   Defendants' motion for summary judgment as to plaintiff Hall's and plaintiff Bishop's claims of wantonness against Morrison and against Wagner and R.A.W. under the theory of *respondeat superior*, is due to be GRANTED. Defendants' motion for summary judgment as to plaintiff Hall's and plaintiff Bishop's claims against Wagner and R.A.W. for negligent and/or wanton hiring, training, and supervision is due to be GRANTED.   Defendants' motion for summary judgment as to plaintiff Hall's claim against Morrison, Wagner and R.A.W. for negligent and/or wanton alteration of the end of the tractor/vehicle is due to be GRANTED.   A corresponding order will be entered contemporaneously herewith.

DONE this 14th day of February, 2014.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE